**Cherry POWE, Plaintiff,**

v.

**GEORGIA PACIFIC COMPANY, INC., Defendant.**

**No. K 77–539.**

United States District Court, W. D. Michigan, S. D.

April 22, 1980.

---

Lawrence P. Schneider of Sinas, Dramis, Brake, Boughton, McIntyre & Reisig, P. C., Lansing, Mich., for plaintiff.

Charles K. Howard of Elarbee, Clark & Paul, Atlanta, Ga., Stephen D. Turner, Baxter & Hammnond, Grand Rapids, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

The above entitled action arises out of a civil rights complaint filed on October 25, 1977 alleging that the Plaintiff was discriminated against in his employment on account of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. (The Act). The Complaint charges the Defendant with unjust discipline and termination of the Plaintiff in violation of The Act.

On April 17, 1974 Plaintiff filed a charge of discrimination with the Michigan Civil Rights Commission (MCRC) alleging racial discrimination in his employment based on his receipt of a written reprimand and one day suspension from his foreman, Don Lacey. Thereafter the Plaintiff filed a Com-

plaint with the Equal Employment Opportunity Commission (EEOC), which took jurisdiction and made attempts to conciliate the parties.

On September 19, 1974, during the pendency of the EEOC investigation, the Plaintiff was discharged by the Defendant. Initially, the Plaintiff believed that his first Complaint covered both incidents in which the alleged discrimination occurred, but he became uneasy with that position and filed a second Complaint on May 23, 1975 with the MCRC. The EEOC later declined to take jurisdiction over this second Complaint on the grounds that it was not timely filed. On July 28, 1977 the EEOC mailed a "Right to Sue" authorization letter, with regard to the first allegation, to the Plaintiff.

At the Pretrial held January 15, 1980, the Court, pursuant to FRCP 42(b), entered an Order bifurcating trial on the issues of liability and damages. Trial on the issue of liability began on March 31, 1980 and concluded on April 1. After the Plaintiff rested, the Defendant made a Motion to Dismiss under FRCP 41(b). The Court denied the Motion, finding that the Plaintiff had established a prima facie case of employment discrimination.

The Court also held that it had jurisdiction over the discharge, as well as the earlier discipline, because the discharge was within the scope of the EEOC investigation reasonably expected to stem from the initial charge of discrimination. Defendant then presented its case in rebuttal. Both parties rested and final arguments were waived.

The following constitutes the Court's Findings of Fact and Conclusions of Law as required by FRCP 52(a):

## FINDINGS OF FACT

### Plaintiff's General Employment History with Defendant:

Plaintiff, a black male, was hired by Defendant at its Kalamazoo plant on September 23, 1968. Through the system established by the collective bargaining agreement, he moved into higher paying positions by bidding on and qualifying for work in different departments. At the time of the alleged discriminatory employment practices, he was working as lead man in the Number One De-Inking Department. Persons in this job classification are responsible for operating a de-inking or hydrapulping machine which converts waste and scrap paper to pulp.

In this key step in the recycling process various types of paper are placed on a conveyor belt which leads to a large vat in which the paper and chemicals are combined and mixed to remove ink from prior printing. To obtain optimal results, it is necessary that the correct amount of paper (in terms of weight) be added, and that the proper mixture of paper types be accomplished. After the lead man places the bales of paper on the conveyor belt, it is his responsibility to record what types of paper have been used in order to maintain a sufficient and correct inventory.

Prior to the first alleged incident of discriminatory discipline, the Plaintiff had been the subject of several minor disciplinary measures. On February 12, 1970, he received a written reprimand for leaving work before being properly relieved. At this time Defendant was utilizing a number of shifts, and its employees were working around the clock. The new shift was to report to work half an hour before the prior shift was scheduled to leave. Once the new shift's relief man had reported and was prepared to take over, the employee from the prior shift could leave, even before the end of the half hour overlap period. On the other hand, if the relief man did not show up, the prior shift's employee was required to stay until another relief man could be located. No evidence as to the particulars of the Plaintiff's violation of this rule on this date was presented, but this same rule is also in issue with respect to a later violation (March 5, 1974).

No further violation of company rules occurred until October of 1972 when the Plaintiff was cited for arriving late for work on one occasion, and for leaving early on another date.

In November of the same year the Plaintiff was given a written reprimand for being absent from his job for four hours.

The Plaintiff maintained a "clean" work record for another year and one-half, until shortly before the incident leading to the filing of a Complaint with the MCRC. On March 5, 1974, the Plaintiff was again cited for leaving work without being relieved. Plaintiff claims that Don Lacey, his relief man at the time (the person who became his foreman and who is charged with being the instigator of the discriminatory action), came to work and told the Plaintiff he could leave. Lacey testified, however, that he was ill that day and had not reported to work—a position confirmed by company records.

These four violations in six years do not establish that the Plaintiff was a poor employee. While it was the testimony of a witness (Holden) that a person with such a record of discipline is not a good employee, the Court does not infer from that statement that Plaintiff was a poor employee. Testimony of the Plaintiff's co-workers showed that he was generally regarded to be a good worker, and one who did not fall behind in his work. As to the Plaintiff's work performance prior to the alleged acts of discrimination the Court concludes that while the Plaintiff was not a model employee, he was, at least, a satisfactory worker.

### Plaintiff's Conflict with Mr. Lacey

Lacey, who became the Plaintiff's foreman in April of 1974, is the focus of the discrimination controversy giving rise to the instant suit. The Plaintiff does not charge Defendant, Georgia Pacific, with a policy and general scheme of discrimination, but seeks to hold the Defendant liable, under a respondeat superior theory, for the actions of its agent and employee, Lacey.

One source of strife between the Plaintiff and Lacey, relating to the latter's relieving of the former, has already been discussed. If the Plaintiff's allegation that Lacey reported for work and told Plaintiff he could go home (then leaving himself, without properly relieving the Plaintiff) were, in fact, true, such conduct might have supported his contention of discriminatory animus on the part of Lacey.

The contrary testimony of Lacey, and the company records supporting Lacey's testimony, in conjunction with the absence of other witnesses testifying that they saw Lacey in the plant that day, persuades the Court that Lacey did not, in fact, come to work on that occasion.

Another more serious, and relevant, cause of embitterment between Plaintiff and Lacey arose from certain racially oriented questions and comments that Lacey directed to the Plaintiff while both parties were union employees. During this period of time, the Plaintiff (a black man) was living with a white woman, and Lacey asked the Plaintiff to compare the sexual performance of white and black women. Lacey also made reference to his plans for going bear hunting in order to shoot "a big black bear", while pointing an imaginary weapon (Plaintiff contends in his direction).

While the above comments were undisputed, the Plaintiff also testified about a statement of Lacey's which the Defendant denies. Plaintiff stated that Lacey told him just prior to his (Lacey's) becoming a foreman that he "might just as well quit because he (Plaintiff) was first on his list".

Plaintiff also alleged that Lacey would come in on certain mornings and say "Oh my goodness, it's another black morning", and that he persisted in asking questions about Plaintiff's white "wife" (including asking if Plaintiff would sell her).

Plaintiff testified, that, after Lacey became a foreman, Lacey would "hassle" Plaintiff, and that when co-workers were able to take a break, Lacey would always find something for Plaintiff to do.

In rebuttal of these charges, Lacey testified that, although he did inquire as to whether "black or white women were better", when he observed that the Plaintiff was offended, he refrained from further questions along that line. It was also established by several witnesses, including union personnel, that these questions had

been asked long before Lacey had been made foreman. When all the testimony had been received, the "bear hunting" comment by Lacey appeared much less offensive, although not wholly innocuous. Indeed, Lacey testified that a running "joke" between he and Plaintiff went to the issue of whether Lacey would get the bear, or vice versa.

As to the potentially most damaging statement regarding Lacey's intention to fire Plaintiff at his first opportunity, the Court after hearing all the evidence, is not persuaded that such a comment was ever made. Additionally, it should be noted, this "threat" was not mentioned in the charge filed with the MCRC, despite the fact that the Plaintiff alleged the threat was made just prior to the discipline leading to the filing of Plaintiff's Complaint. Such a threat would have been a substantial matter for the MCRC to consider and investigate.

The rest of the Plaintiff's allegations were uncorroborated and denied, except for the charge that Lacey was "hassling" the Plaintiff. One of the Plaintiff's co-workers (Miller) testified that he was concerned that Lacey was being too harsh on the Plaintiff and that he tried to dissuade him from "picking on" the Plaintiff. Even that witness did not testify as to any racial motivation on Lacey's behalf with regard to Lacey's conduct. Indeed not a single witness, save Plaintiff, testified about any racial overtone in Lacey's conduct and dealings with Plaintiff, or any other employee.

### The Reprimand and Plaintiff's Allegations of Radical Discrimination

On April 17, 1974, Lacey, who had just been promoted from an hourly employee to temporary foreman (three days earlier), asked the Plaintiff to take a forklift to the repair shop. Lacey contacted the Plaintiff with regard to moving the forklift on four occasions, with his approach progressing from a general request to a direct order. After each contact the Plaintiff failed to take the forklift into the repair shop claiming, either that he would do it after he got

a load set up in the hydrapulper, or that he was too busy at the time. Lacey spoke with his supervisor (Holden) with regard to the Plaintiff's inaction and was told to directly order the Plaintiff to take the "mule" to the shop, and that if Plaintiff refused, he should be sent home for the day. Plaintiff again refused, despite the direct order, and was sent home.

This confrontation between two men of formerly equal status would present little evidence of discrimination, if it were not for the allegation that this was but another instance of Lacey (a white man) "picking on" the Plaintiff (a black man) because of his race. If all of the Plaintiff's allegations had either been substantiated by other witnesses, or unrebutted, the orders and discipline meted out on the 17th of April might have demonstrated the supervisor's discriminatory intent. The weakened inferences derived from Plaintiff's testimony regarding Lacey's racial hostility, in conjunction with testimony relating to Lacey's reluctance to discipline a fellow union member (as temporary foreman Lacey was still in the union), leads the Court to a contrary factual conclusion.

In particular the colloquy between Lacey and his supervisor, as to standard procedure for refusal of a direct order, requires the conclusion that Lacey's decision to send the Plaintiff home was primarily motivated by his desire to maintain control and authority in the position he had just acquired.

### Discharge and Plaintiff's Allegations of Racial Discrimination

Three months after the Plaintiff was disciplined for failing to obey a work order, his ability and willingness to maintain proper records of the hydrapulper operations became an issue. The discipline invoked progressed from an oral warning to a written reprimand on July 29, 1974 and to a thirty day suspension on August 16, 1974. Although the Plaintiff stated that he was not sure what led to his suspension, and that he could not remember a meeting in which company and union officials attended, (at which proper record keeping was explained

to him), the Court is satisfied that Plaintiff knew the source of Defendant's concern, and understood the purpose of the meeting.

The Defendant presented testimony verifying its renewed interest in proper record keeping. Defense witnesses explained that a shortage of waste and scrap paper during this period necessitated stricter control over its inventory. It was unclear from the testimony if the Plaintiff had been properly recording the amounts and types of paper utilized prior to this time (by August he had been stationed at his job for eight months). Even were he to have experienced this sort of difficulty all along, the renewed interest in proper record keeping was not limited, solely, to the Plaintiff and his performance.

On August 16, 1974, another meeting was held in which company and union officials were present, and Plaintiff was notified of a thirty day suspension. The personnel manager (Boring) informed the Plaintiff that he was to return to work on September 16 on his regularly scheduled shift. He was further told to check with his immediate supervisor for the time of day his shift would be working when he returned. On August 19, the personnel manager sent the Plaintiff a letter, by certified mail, confirming the suspension and the date on which he was to return. Plaintiff did not return on September 16, but instead reported to work on the 18th of September, a date he alleged had been given to him by Lacey.

There are several factors that undercut the Plaintiff's position that Lacey gave him the wrong date in order to obtain his dismissal. Had a different date been given to the Plaintiff immediately after the August 16 meeting by Lacey, it would have been incumbent on the Plaintiff to check back with the Defendant company especially after the original date was later confirmed by letter, which Plaintiff admits he received. In addition, it seems incredible that the Plaintiff would put so much faith in the words of the man whom he believed was attempting to get him fired.

While the above considerations merely undermine the credibility of the Plaintiff's claim by inference, there was also direct evidence, in the form of testimony, that he was not so misinformed. Lacey and another (Mr. Poth), who overheard the conversation between Lacey and the Plaintiff testified that Plaintiff was consistently told by Lacey to report back to work on the 16th.

The final issue of fact concerns the discharge of the Plaintiff on September 19, 1974 for failing to report in while missing two consecutive days of scheduled work. Plaintiff contends that he would not have been fired, but for the discriminatory actions of Lacey. Defendant, on the other hand, contends that it was merely following the disciplinary system that had been agreed upon between labor and management, and that such discipline was applied uniformly. The evidence showed that the Defendant had terminated a number of employees for failing to report for two consecutive days, and that there had not been a disproportionate number of minority employees subject to such discipline.

The proofs also showed, however, that this case was unique in that the employee did return the third day, and distinct in that the employee claimed that he believed he was returning to work at the proper time. Thus, while the discharge is apparently shielded by general practice, it is an instance where Defendant might have considered discharge to be too harsh a remedy.

The decision to discharge was the responsibility of the personnel manager. Although a supervisor, such as Lacey, could recommend a certain type of discipline, corporate policy favoring consistent treatment of employees, required that the final decision be that of a single individual. While it is impossible to gain a clear image of the motivation behind the decision to terminate the Plaintiff, there were no external signs that the Defendant's agents desired to discharge Plaintiff because of his race, or in retaliation for filing a charge of discrimination with the MCRC and the EEOC. Nor is there *any* evidence that Lacey recommended discharge.

## CONCLUSIONS OF LAW

The Plaintiff, in a Title VII action (42 U.S.C. Section 2000e et seq.), must carry

the initial burden of establishing a prima facie case of race discrimination. The predominant test for determining whether a prima facie case has been proven, is set forth by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973):

> This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons's of complainant's qualifications.

Subsequent to the *McDonnell Douglas* decision appellate courts have reformulated the test so as to apply to the discharge setting. The Sixth Circuit has characterized the test for discharge as follows:

> . . . [A] Title VII plaintiff must only show that he is a member of a class entitled to the protection of the Civil Rights Act, that he was discharged without valid cause, and that the employer continued to solicit applications for the vacant position. *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, 865 (CA 6 1975).

■ In the case at bar the Court finds that Plaintiff met the initial "prima facie test", at the time he rested his proofs, by substantially complying with the *Potter* test, and the Court denied Defendant's Directed Verdict Motion accordingly. Plaintiff proved that he was in a statutorily protected class, had adequately performed his job in the hydrapulper department of Defendant; had been the subject of racial comments uttered by an agent of Defendant (albeit at a time when the agent was not an agent); and that the apparently acrimonious relationship with the new supervisor had led to discipline, and, ultimately, discharge.

The Plaintiff also met his initial burden with respect to the prior incident in which he was reprimanded for failing to follow the instruction of his immediate supervisor. Although *McDonnell Douglas*, supra, is not directly applicable to this situation, the essence of its reasoning (in order to submit a prima facie case of disparate treatment) is of guidance and has been restated by another Supreme Court decision:

> *McDonnell Douglas* did make clear that a Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under this Act' (cite omitted) *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)

Plaintiff's testimony that Lacey had threatened to fire him as soon as he came to power, in conjunction with his earlier racial remarks, raises the requisite presumption that the initial request and subsequent orders as well as the reprimand which followed, were based on forbidden racial criteria.

■ Once the Plaintiff has carried the initial burden of making a showing of the prima facie case, the burden shifts to the Defendant employer to "articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corporation*, supra, at 802, 93 S.Ct. at 1824; *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978).

■ Defendant, after submitting its proofs, sustained its burden, by specifying the business consideration that it felt necessitated the disciplinary actions.

As for the reprimand, the Defendant's reason submitted for the order and suspension is deemed to satisfy the test. Management personnel are given the authority to direct the actions of union employees in their department. Such power is commonly believed to be necessary to the traditional structure of industrial enterprises in which centralized decision making plays a large role. With such authority to command comes the concomitant power to discipline

for failure to appropriately respond to supervisory directives.

In this instance it was not disputed that Lacey had discretion in whom he chose to move the forklift truck, and that he selected the person who had been using the machine—the Plaintiff. It is further not in dispute that Lacey checked with his immediate supervisor as to what he should do if the Plaintiff refused to move the forklift, and was told that order and control should be maintained and that the Plaintiff should be sent home if he refused a direct order. The above factual evidence adduced by the Defendant constitutes an adequate articulation of a reason consistent with standard, generally accepted business values.

The disciplinary measures taken after the reprimand and initial charge of discrimination with the MCRC were also supported by articulated reasons. The Defendant's evidence demonstrated the importance of accurate record keeping and the Plaintiff's inability to comply with the record keeping responsibilities in his job. The Defendant has again sustained its burden by persuasive testimony that it based its employment decision on a legitimate business consideration and not on an illegitimate factor, such as race.

The above is not intended to indicate that the Court approves the Defendant's insensitivity with regard to the Plaintiff's situation, or that it believes that the company was prudent in leaving the Plaintiff under the supervision of one whom the Plaintiff believed was discriminating against him, and with whom Plaintiff had previously disagreed. Nor does it mean that the company's indifference to the Plaintiff's difficulty was truly consistent with the principles of affirmative action that the Defendant alleged, by an exhibit, was its standard.

This Court is, however, limited to considering whether the Defendant pursued the course which would enable it to achieve its own business goal, and not whether this course would also maximize the fulfillment of the goal of affirmative action or other moral requirements.

The discharge of the Plaintiff for failing to report in for two consecutive days was also adequately explained by the Defendant. Defendant effectively expressed its need for timely, regular attendance by its employees. Although it was not required to fire all employees who failed to report in this manner, it showed that it felt it was a necessary perogative and had bargained for this right in the contract with the union.

■ Once the Defendant has presented its legitimate, nondiscriminatory reasons, the burden again shifts to the Plaintiff. In the final analysis, "*McDonnell Douglas* leaves the burden of persuasion at all times with the plaintiff . . . (the defendant's burden) is a burden of production—i. e., a burden to articulate or state a valid reason, following which the complainant must show that the reason so articulated or stated is a mere pretext or 'cover up' for what was in truth a discriminatory purpose" *Loeb v. Textron*, 600 F.2d 1003, 1011–1012 (CA 1 1979). See generally *McDonnell Douglas*, supra.

■ The Plaintiff has not proven that the business reasons given by the Defendant were merely pretextual and that the Defendant's primary motivation was racial in nature. Motive is an elusive matter to prove. Usually it must be proven indirectly since most discriminators before the courts today are too sophisticated to admit to discriminatory intent either on the witness stand or in their inner-company memoranda.

One form of indirect evidence of true intent that would demonstrate the pretextual nature of the asserted business reason has been recognized by the Supreme Court to be "especially relevant". This is "evidence that white employees involved in acts against (the employer) of comparable seriousness [were not similarly disciplined]". *McDonnell Douglas*, supra 411 U.S. at 804, 93 S.Ct. at 1825. In the case before the Court the Plaintiff presented no evidence of other employees refusing direct orders of their immediate supervisor who were not sent home for the day. Alternatively, the Plaintiff could have presented other indi-

rect evidence of discriminatory intent, but he did not. Therefore the reprimand is not found to be discriminatory by this Court.

The Plaintiff also failed to sustain his overall burden with respect to the 30 day suspension and ultimate discharge. Although the Plaintiff was able to show that the management was aware that the Defendant had filed a charge with MCRC and EEOC, he was not able to show that this caused the ultimate suspension and discharge. The Plaintiff was able to establish that, overall, he was a fair worker.

He was unable however, to show that other workers of his caliber were not disciplined when they were guilty of the same infractions of the rules. In particular, Plaintiff failed to show that the majority race was treated any differently than he was when its members failed to report in for two consecutive days.

Even if this Court were to find that race was one factor taken into consideration by one member of Defendant's management, Plaintiff could not prevail unless he "prove[d] by a preponderance of the evidence that his [race] was the 'determining factor' in his (reprimand and) discharge in the sense that, 'but for' his employers motive to discriminate against him because of (race) he would not have been (reprimanded and) discharged." *Loeb v. Textron*, 600 F.2d 1003, 1019 (1979).

In this case the Plaintiff presented evidence of some antipathy based on his race, but he failed to prove, by a preponderance, that this resulted in discriminatory conduct by his supervisor, Lacey, or by his employer, Georgia Pacific.

Judgment shall be entered in favor of the Defendant, with neither party awarded costs or fees.